IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**EQUAL EMPLOYMENT OPPORTUNITY**
**COMMISSION,**

        Plaintiff,

**LORENA PIÑON,**

        Applicant in Intervention,

v.                                      CV-05-1048 JB/WPL

**UNIVERSITY OF PHOENIX, INC.,**

        Defendant.

## COMPLAINT FOR DAMAGES FOR SEXUAL HARASSMENT, RETALIATION, CONSTRUCTIVE DISCHARGE, BREACH OF CONTRACT AND <u>NEGLIGENT SUPERVISION AND RETENTION</u>

Plaintiff Lorena Piñon, by and through undersigned counsel, states:

**Parties, Jurisdiction and Venue**

1. Plaintiff Lorena Piñon (hereafter "Plaintiff" or "Ms. Piñon") is a female citizen of the United States and a resident of El Paso, Texas.

2. Defendant University of Phoenix, Inc. (hereafter "Defendant" or "University of Phoenix") is an Arizona corporation doing business in Doña Ana County, New Mexico. Based on the number of Defendant's employees and their duration of employment, Defendant is an employer subject to the statutory requirements of Title VII.



3. The events giving rise to this complaint occurred at Defendant's place of business in Santa Teresa, Doña Ana County, New Mexico.

4. This Court has jurisdiction over the parties and the subject matter of this action.

5. Venue is proper in this court.

6. Plaintiff has exhausted her administrative remedies as to her claims under Title VII of the Civil Rights Act of 1991 (hereafter "Title VII"), having timely filed two separate charges with the U.S. Equal Employment Opportunity Commission (hereafter "EEOC") and has satisfied all conditions precedent to filing this lawsuit.

## General Allegations Common to All Counts

7. At all material times, Plaintiff was employed by Defendant and worked at the Defendant's place of operations in Santa Teresa, New Mexico. At all times material hereto, Plaintiff's work performance was satisfactory or better.

8. In 2000, Plaintiff began her employment with University of Phoenix as an Academic Counselor. She held that position until mid-2003, when she was promoted to the position of Program Manager. After several months with that title, she was assigned the position of Education Program Director. She was later given the title of Academic Affairs Project Manager and substantially reduced responsibilities.

9. Beginning in 2002, and continuing through 2004, Ms. Piñon also served on the faculty of University of Phoenix and taught classes. This was a

separate position for which she received additional or separate pay.

10. During her employment with University of Phoenix, Ms. Piñon was supervised by a series of persons, to include: Pamela Snow, Director of Operations; Brian Russo, Academic Affairs Manager; Darren Adamson, Director of Academic Affairs New Mexico; and Andrew Barber, both in his capacity as College Campus Chair for the Behavioral Science Department and as Director of Academic Affairs. At material times, all of these persons occupied supervisory and managerial positions that were superior to Plaintiff.

11. While employed by University of Phoenix, Plaintiff was regularly subjected to comments by Andrew Barber ("Barber") regarding her physical appearance and body parts, comments of a sexual nature, requests for dates, sexual overtures and sexual innuendoes.

12. At various times during employment with University of Phoenix, she was subjected to unwelcome touching by Barber.

13. Throughout the time when she was employed by University of Phoenix, Plaintiff refused Barber's advances.

14. Despite Plaintiff's efforts to rebuff Barber's advances, his behavior persisted. In September, 2003, Barber called her at home and left a message. Plaintiff changed her home telephone number so he could not call again.

15. In December, 2003, Plaintiff was told that her direct supervisor would be Barber, because he was serving as the Interim Director of Academic

Affairs. During that same month, Barber asked her if she would go out with him if he became Director of Academic Affairs. She said no.

16. On December 9, 2004, Manny Ortiz, Campus Director, told her to move out of her office and told her to move into a cubicle. He also invited her to share an office with Barber when it became vacant. She told him that she did not want to share an office with Barber and that she would stay in a cubicle.

17. Plaintiff received decreased job duties and had fewer opportunities to progress and attend training programs that would help her to succeed in her work. Instead, a part-time consultant, Patricia Williams, was sent for training. Plaintiff complained to Barber and Ortiz, to no avail.

18. Plaintiff's job duties continued to be reduced and her job title became ambiguous. At one time, she received paperwork indicating that she would be titled as Credential Analyst. More and more of her prior job duties were assigned to the part-time consultant, Williams. Plaintiff's primary duties were reduced to keeping a filing system for student records.

19. Plaintiff repeatedly sought clarification of her job title and scope of duties from her superiors and Human Resources staff. She told Human Resources that she felt that she had been demoted.

20. In late March, 2004, Barber rubbed against Plaintiff as she stood up from her desk. She confided in a co-worker, who shared that she, too, had felt uncomfortable with his behavior.

21. On March 24, 2005, Plaintiff called April Harper of the Human Resources department and inquired about the procedure for filing a sexual harassment complaint.

22. The following day, Barber asked Plaintiff for information because he planned to do her semi-annual performance review. Plaintiff asked April Harper of Human Resources to sit in on the performance review.

23. On the next day, March 26, 2004, Barber again subjected Plaintiff to unwanted touching by grabbing and pulling on her long hair.

24. On March 29, 2004, Plaintiff again spoke with April Harper of Human Resources and further detailed the nature of her complaints. Harper indicated that her complaint would be investigated and asked her to provide more details in writing, which Plaintiff did within several days.

25. Barber persisted with his plans to evaluate Plaintiff. Plaintiff told April Harper and Randy Lichtenfeld, Regional Vice President, that she was uncomfortable having Barber evaluate her after he had been sexually harassing her. Both told her that the evaluation would go forward, although she could have another manager present.

26. The workplace became increasingly uncomfortable to Plaintiff. Her health began to decline with stress-related ailments.

27. Plaintiff sought medical treatment and was told to stay on leave. A doctor's note was sent to Human Resources and she was placed on leave which was identified as have been done pursuant to the Family and Medical Leave Act (FMLA).

28. On April 12, 2005, April Harper of Human Resources sent a letter indicating that her concerns had been investigated and properly addressed with appropriate action. Plaintiff received the letter on April 19, 2004, and followed up with Harper for more information. Harper would not give her any more information.

29. Barber continued to work in his same position.

30. Plaintiff's treatment provider advised that she could return to work if she could be moved away from a cubicle in the physical vicinity of Barber and if she was no longer required to work under the direct supervision of Barber. Plaintiff requested those accommodations of her employer and provided notes from her physician and therapist. Her request was denied.

31. Plaintiff's available leave was exhausted and she was denied worker's compensation. She had to choose between quitting her job and returning to work. Out of financial need, she chose to return to work.

32. Plaintiff returned to work in the same cubicle, in the vicinity and under the supervision of Barber. Her anxiety increased and her health suffered.

33. After returning to work, on more than one occasion, Barber again touched Plaintiff and she again told him to stop.

34. The lack of clarity about Plaintiff's position and the filing assignments resumed. A co-worker confided that Barber had stated that he wanted to get rid of Plaintiff.

35. In June, 2004, Ms. Piñon filed her first charge of discrimination with the EEOC and alleged that she was discriminated against by University of Phoenix when she was sexually harassed by a supervisor and then retaliated against when she rejected his advances and complained to her employer.

36. Plaintiff was denied the bonus check that other employees had received. The reason given was that she had been on FMLA leave.

37. In July, 2004, Plaintiff received the lowest evaluation she had ever received at the University of Phoenix. She was placed on a performance plan.

38. Plaintiff continued to have other problems with her work. She was accused of mishandling documents.

39. In early August, 2004, the EEOC conducted site interviews as part of its investigation of Plaintiff's charge of discrimination.

40. Plaintiff continued to have ambiguous job duties. However, after the EEOC investigation, her request to be moved to another cubicle was finally granted.

41. On August 9, 2004, Plaintiff learned that Barber had been placed on administrative leave.

42. On August 17, 2004, Plaintiff received a call from Human Resources and was told that Barber was no longer with the University. Plaintiff questioned whether her negative evaluation and performance plan would stay in place and was told it would.

43. Plaintiff persisted in trying to assume more job duties and sought to get back some of the job responsibilities that had been taken away from her. The management began to ask her to log what she was doing, despite that she was given little more to do than a file clerk. Her efforts to get her job back on track were not successful.

44. On or about September 15, 2004, Plaintiff resigned her position as Academic Affairs Program Manager because she could no longer tolerate the workplace. She did not resign her teaching position as a faculty member.

45. On information and belief, University of Phoenix continued to give Barber teaching assignments.

46. In February, 2005, University of Phoenix discontinued Ms. Piñon's teaching assignments without cause and without stating a reason.

47. On March 29, 2005, the EEOC issued a probable cause determination against University of Phoenix, finding that Ms. Piñon and had been subjected to a sexually hostile work environment and that Ms. Piñon had been subjected to retaliation.

48. In late March, 2005, Ms. Piñon submitted a second charge of discrimination against University of Phoenix, because she felt that her teaching assignments had been discontinued in retaliation for her previous charge of discrimination.

49. In December, 2005, undersigned counsel requested a Notice of Right to Sue on behalf of Ms. Piñon so that all claims could be brought through

intervention in this litigation.    The Notice of Right to Sue was issued on December 14, 2005.

### Count I: Hostile Work Environment Sexual Harassment

50. Plaintiff incorporates the allegations contained in the preceding paragraphs as though fully set out herein.

51. During the course of her employment by Defendant, Plaintiff was subjected to acts of sexual harassment which included but were not limited to severe and pervasive sexual advances and other verbal and physical conduct of a sexual nature, all of which Plaintiff did not welcome.

52. Unwelcome, severe and pervasive sexual behavior toward Plaintiff, and the inadequacy of Defendant's response thereto, had the purpose and effect of unreasonably interfering with Plaintiff's work performance and/or creating an abusive, intimidating, hostile and offensive work environment, which directly affected the terms, conditions and privileges of Plaintiff's employment and violated her statutory rights to be free from discrimination on the basis of gender.

53. Defendant failed to take adequate measures to prevent, investigate, and eradicate sexual harassment in Plaintiff's workplace.

54. Defendant failed to take adequate steps to stop the behavior, and failed to take any measures designed to promptly prevent and remediate acts of sexual harassment, both before and after, and/or as a result of, any of the incidents alleged herein.

55. Defendant's failure to prevent, eradicate, and promptly remediate sexual harassment amounted to a condonation and ratification of sexual behavior and Defendant's omissions perpetuated an abusive and hostile work environment.

56. By creating, condoning and perpetuating a sexually hostile work environment, Defendant has intentionally and with reckless indifference violated Plaintiff's rights under Title VII, thereby justifying an award of punitive damages.

57. Defendant's condonation, ratification, tacit approval and perpetuation of sexual behavior has caused Plaintiff to suffer severe humiliation, embarrassment, degradation and emotional and physical distress, as well as economic losses.

58. Plaintiff further alleges that the acts of Defendant, through its employees and agents, singularly or in combination, constitute sexual harassment, discriminatory and disparate treatment of Plaintiff, as consequence of her gender.

59. University of Phoenix employees and agents, including those named herein, acted in a willful, malicious, intentional and unlawful manner, and in reckless disregard of Plaintiff's rights, and Plaintiff demands and is entitled to exemplary or punitive damages in an amount which bears a reasonable relationship to her actual damages.

## Count II: Retaliation

60. Plaintiff incorporates the allegations contained in the preceding paragraphs as though fully set out herein.

61. Plaintiff opposed the sexual harassment by resisting unwelcome sexual advances and other verbal and physical conduct of a sexual nature, by reporting same to her supervisor and to others in the supervisory chain, and ultimately by filing a charge of discrimination with the EEOC, which opposition and participation is statutorily protected by Title VII.

62. Managerial employees of University of Phoenix, with knowledge and in response to Plaintiff's opposition as described above, subjected Plaintiff to adverse employment action, including reduced title, reduced job duties, denial of a bonus, an unwarranted negative evaluation, and ultimately, forced termination. She also was terminated from her position as a faculty member when she was denied continuing teaching assignments.

63. Defendants based their employment actions on false or pretextual bases.

64. As a direct and proximate result of the actions of University of Phoenix employees and agents, including those named herein, Plaintiff has suffered harm for which she is entitled to compensatory and punitive damages.

65. University of Phoenix employees and agents, including those named herein, acted in a willful, malicious, intentional and unlawful manner, and in reckless disregard of Plaintiff's rights, and Plaintiff demands and is entitled to exemplary or punitive damages in an amount which bears a

reasonable relationship to her actual damages.

### Count III: Constructive Discharge

66. Plaintiff incorporates the allegations contained in the preceding paragraphs as though fully set out herein.

67. University of Phoenix, when informed by Plaintiff that sexual harassment was occurring in the workplace, took little action to remediate the situation and to discipline employees.

68. When Plaintiff complained of retaliation, University of Phoenix similarly failed to appropriately investigate and remediate the situation.

69. University of Phoenix's actions and inactions created working conditions so difficult and intolerable to Plaintiff that a reasonable employee in Plaintiff's position would have no choice but to cease working for University of Phoenix.

70. As a direct result of University of Phoenix's conduct, Plaintiff resigned, and University of Phoenix's conduct constitutes a constructive discharge of Plaintiff.

71. As a direct and proximate result of Defendant's inaction and negligent supervision of its agents and employees, Plaintiff has sustained damages as outlined in paragraph 57, above.

72. Defendant's employees and agents acted in a willful, malicious, intentional and unlawful manner, and in reckless disregard of Plaintiff's rights, and Plaintiff demands and is entitled to punitive damages in an amount which bears a reasonable relationship to her actual damages.

## Count IV: Breach of Implied Contract of Employment

73. Plaintiff incorporates the allegations contained in the preceding paragraphs as though fully set out herein.

74. Plaintiff was employed by Defendant under an implied contract of employment that was established, modified and enforced by certain policies, practices, assurances and other express and implied statements. Those policies banned gender discrimination and harassment and mandated immediate and appropriate investigation of complaints, as well as appropriate discipline. Further, these policies indicated that parties who complained of discrimination and/or harassment would not suffer retaliation for their complaint.

75. At all material times, Plaintiff performed her obligations under her contract with Defendant.

76. Defendant breached the contract by failing to act in accordance with its own policies and procedures as laid out in its personnel policies and ancillary documents. Defendant failed to enforce its prohibitions against sexual harassment, discrimination and retaliation, failed to take prompt adequate and appropriate remedial action, and failed to protect Plaintiff from retaliation.

77. Defendant's breaches have caused Plaintiff to suffer loss of wages and benefits.

## Count V: Negligent Supervision & Retention

78. Plaintiff incorporates the allegations contained in the preceding paragraphs as though fully set out herein.

79. Barber was placed in a position of supervisor at the University of Phoenix's facility in Santa Teresa, New Mexico and supervised a number of its employees, including Plaintiff.

80. The acts of harassment and retaliation perpetrated against Plaintiff by Barber and others while they were employed by University of Phoenix and were in the course and scope of their employment.

81. University of Phoenix knew or reasonably should have known of their employees' conduct with Plaintiff and others, and knew or reasonably should have known that this conduct would harm Plaintiff and others.

82. University of Phoenix owed a duty of care to Plaintiff and other similarly situated female employees to provide a safe work environment, which included the duty to protect them from sexual harassment and other inappropriate behavior perpetrated by University of Phoenix' employees, as well as the duty to enforce its policies designed to protect employees from harassment and retaliation.

83. University of Phoenix failed to effectively monitor Plaintiff's work environment and its employees' conduct, failed to adequately investigate complaints of sexual harassment and retaliation, failed to take effective remedial action, and failed to provide effective training to all employees concerning the prohibition against, the prevention of, and the proper

investigation of inappropriate conduct. University of Phoenix thereby failed to eradicate the acts of sexual harassment, retaliation and inappropriate behavior exhibited toward the Plaintiff.

84. University of Phoenix failed to properly supervise Barber, and retained him in his supervisory position despite his conduct, thereby breaching its duty to Plaintiff and others.

85. University of Phoenix knew or should have known that if it did not effectively monitor the work environment and its employees' conduct, that if it did not adequately investigate complaints of sexual harassment and retaliation, that if it did not take effective remedial action, and that if it did not provide effective training to all employees, harm to employees would likely be caused by such acts and omissions.

86. As a direct and proximate result of University of Phoenix's failure to supervise its employees and failure to take adequate measures to prevent, remediate and eradicate sexual harassment and retaliation, Plaintiff has suffered harm.

87. Because the conduct of its employees occurred while acting within the course and scope of their employment and with University of Phoenix's knowledge and implied consent and approval, University of Phoenix is responsible for the injuries to Plaintiff and for damages.

88. As a direct and proximate result of Defendant's inaction and negligent supervision of its agents and employees, Plaintiff has sustained damages as outlined in paragraph 57, above.

89. Defendant's employees and agents acted in a willful, malicious, intentional and unlawful manner, and in reckless disregard of Plaintiff's rights, and Plaintiff demands and is entitled to punitive damages in an amount which bears a reasonable relationship to her actual damages.

## Prayer for Relief

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

a. Jury trial on all issues so triable;

b. Compensatory damages in an appropriate amount (as yet undetermined);

c. Actual, incidental and consequential damages on the breach of contract claim;

d. Punitive damages in an appropriate amount (as yet undetermined);

e. Reasonable attorneys' fees and costs;

f. Pre- and post-judgment interest as applicable; and

g. Such other and further relief as the Court deems proper.

Respectfully submitted,

**ALMANZAR & YOUNGERS, P.A.**

*[signature]*
Joleen K. Youngers
P.O. Box 7256
Las Cruces, New Mexico 88006
505/ 541-8000
505/ 541-9000 (Fax)

*Attorney for Lorena Piñon*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed on this ___ day of February, 2006 to:

Loretta Medina
Veronica A. Molina
Equal Employment Opportunity Commission
Albuquerque District Office
505 Marquette NW, Suite 900
Albuquerque, NM 87102

Stanley K. Kotovsky, Jr.
The Tinnen Law Firm
500 Marquette NW, Suite 1300
Albuquerque, NM 87102

William R. Hayden
James K. Mackie
Matthew D. Mitchell
Snell & Wilmer, LLP
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2002

Joleen K. Youngers