## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

and

LORENA PINON and
LORETTA GRADO,

        Intervenors,

vs.                                   No. CIV-05-1048 JB/WPL

UNIVERSITY OF PHOENIX, INC.,

        Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion for Summary Judgment, filed August 4, 2006 (Doc. 64)("Summary Judgment Motion"); and (ii) Plaintiff Loretta Grado's Motion for Partial Summary Judgment, filed August 4, 2006 (Doc. 66)("Partial Summary Judgment Motion"). The Court held a hearing on the motions on October 31, 2006. The primary issues are: (i) whether Plaintiffs Loretta Grado[1] and the Equal Employment Opportunity Commission ("EEOC") have presented sufficient evidence that there are genuine issues of material fact concerning the constituent elements of their claims against Defendant University of Phoenix, Inc. ("University") for sexual harassment, retaliation, intentional infliction of emotional distress, and negligent supervision; (ii) whether the Plaintiffs can seek punitive damages at trial; and (iii) whether the

---

[1] Loretta Grado was formerly known as Loretta Rodriguez.

University or the Plaintiffs are entitled to summary judgment on the Faragher/Ellerth defense. Because the Court finds that disputed issues of material fact preclude the granting of judgment as a matter of law on the claims for sexual harassment, retaliation, and negligent supervision, the Court will deny the University's request for summary judgment on those claims. Because the Court, accepting all of the relevant facts in favor of Grado, concludes that Grado cannot prevail on the law on her intentional infliction of emotional distress claim, the Court will grant the University's request for summary judgment on that claim. Because the Court further finds that material factual disputes exist regarding the applicability of punitive damages to this case, the Court will deny the University's request for summary judgment on the issue of punitive damages. Finally, because the Court concludes that material factual disputes prevent the granting of judgment as a matter of law on the issue of the Faragher/Ellerth defense either to the University or the Plaintiffs, the Court will deny both the University's and the Plaintiffs' requests for summary judgment on that issue.

## FACTUAL BACKGROUND

The University employed Grado as a Program Specialist at the Santa Teresa Campus from July 1, 2003 through May 28, 2004. See Plaintiff Loretta Grado's Statement of Undisputed Facts at 1, filed August 4, 2006 (Doc. 67)("Grado's Fact Statement"); id., Exhibit 14, Deposition of Loretta Grado at 20:18-21:2 (taken March 8, 2006)("Grado Deposition"); Defendant's Response to Plaintiff Loretta Grado's Separate Statement of Facts at 1, filed August 28, 2006 (Doc. 81)("Defendant's Fact Response"). As a Program Specialist, Grado entered new student information into databases, submitted transcripts to other institutions, counseled students regarding transcripts and credits, and administered College Level Examination Program testing. See Grado Deposition at 34:9-25; Defendant's Fact Response at 1. Grado's immediate supervisor at Santa Teresa was

Brian Russo; Russo's immediate supervisor was Pamela Snow-Armendariz.  <u>See</u>  Grado Deposition at 35:5-18; Defendant's Fact Response, Exhibit A, Deposition of Pamela Snow-Armendariz at 69:17-24 (taken April 21, 2006)("Snow-Armendariz Deposition").  Grado had occasion to report to both Russo and Snow-Armendariz.  <u>See</u> Grado Deposition at 35:5-18.  Manuel ("Manny") Ortiz was the Campus Director during Grado's employment at Santa Teresa.  <u>See</u> Grado's Fact Statement, Exhibit 16, Deposition of Brian Russo, Vol. I, at 30:22-31:4 (taken March 7, 2006)("Russo Deposition"); Defendant's Fact Response at 2.

Before Grado complained about Ortiz' behavior, at least one other employee had complained to the University about Ortiz' behavior.  <u>See</u> Grado's Fact Statement, Exhibit 2, Letter from Angela Rowe Luttrell to Laura Palmer Noone (dated July 28, 2003).  Angela Luttrell, a Finance Counselor at the Santa Teresa Campus, wrote a letter to University President Laura Palmer Noone regarding what she perceived as Ortiz' threatening behavior towards women.  <u>See id.</u>  Luttrell's letter stated:

> Mr. Ortiz has a very low opinion of women and treats them as inferiors.  He is belligerent, hostile, and aggressive towards them.  Not only did Mr. Ortiz threaten me, he slandered me in front of a large group of my peers. . . .  I am not the first woman he had treated this way, I am aware of others.

<u>Id.</u> at 2.  The University investigated Luttrell's complaint, conducting interviews of Luttrell and other employees.  <u>See</u> Defendant's Fact Response, Exhibit C, Deposition of Christine J. Springfield, Vol. II, at 199:2-203:19 (taken July 13, 2006)("Springfield Deposition").  During the investigation, the University received an anonymous e-mail that stated: "When you guys are done covering Manny's ass, maybe you can look into the employees he sexually harasses and the student he is sleeping with . . . ."  Springfield Deposition, Attachment 50, E-mail from Anonymous to Christine Springfield (dated August 4, 2003).  None of the employees interviewed in the course of the investigation

reported concerns about Ortiz engaging in inappropriate sexually related behavior.  See Springfield Deposition, Vol. II, at 199:2-203:19; id., Attachment 122, Investigation Summary (dated August 8, 2003).  The investigation found that some employees believed that Ortiz inappropriately disciplined and evaluated employees.  See Springfield Deposition, Vol. II, at 199:2-203:19; id., Attachment 122, Investigation Summary (dated August 8, 2003).  Based upon the investigation's findings, the University issued Ortiz a Final Written Warning, requiring Ortiz to act professionally at all times and to conduct discussions concerning employee performance in a confidential manner.  See Springfield Deposition, Attachment 139, Final Warning from Randy Lichtenfeld and Debra Baldwin to Manual Ortiz (dated August 20, 2003).

The University has, and at the time of Grado's employment had, a Discrimination and Harassment Policy.  See Grado's Fact Statement, Exhibit 5, Discrimination and Harassment Policy; Defendant's Fact Response at 4.  The University's Discrimination and Harassment Policy requires employees who believe they are victims of sexual harassment to report the harassment to their supervisors, the Human Resources Department, or the Employee Services Department.  See Grado's Fact Statement, Exhibit 5, Discrimination and Harassment Policy; Defendant's Fact Response at 4. The University's Discrimination and Harassment Policy requires supervisors to report incidents of sexual harassment of which they are aware to the Human Resources Department.  See Grado's Fact Statement, Exhibit 15, Deposition of April Harper at 32:4-24 (taken April 13, 2006)("Harper Deposition").

Grado reported Ortiz' harassment of her to Russo and Snow-Armendariz.  See Grado Deposition at 61:1-25; id. at 66:13-68:25; id. at 131:8-23; id. at 186:18-187:25. Grado first informed Russo in July or August 2003 of her concern about the constant attention Ortiz gave her.  See id. at

66:13-18.   Grado and Chris Camp told Russo about a number of incidents involving Ortiz' inappropriate behavior towards Grado.   See id. at 60:1-61:18; id. 67:9-16; id. at 68:11-69:3; id. at 84:14-85:7; Grado's Fact Statement, Exhibit 13, Deposition of Chris Camp, Vol. I, at 232:6-9 ("Camp Deposition").

Russo acknowledged that Grado may have complained to him about Ortiz' conduct as many as twenty times.   See Russo Deposition, Vol. II, at 79:23-80:2.   Russo and Snow-Armendariz testified that they did not report Ortiz' alleged harassment of Grado to the Human Resources Department, because they feared retaliation from Ortiz.   See Russo Deposition, Vol. I, at 209:14-24; Snow-Armendariz Deposition at 127:14-22; id. at 171:3-12.   Russo also testified, however, that he remembered Grado complaining to him only once about Ortiz' behavior before the University began its investigation of sexual harassment allegations against Ortiz, and that her concern regarded Ortiz frequently calling her work phone and coming by her cubicle.   See Russo Deposition, Vol. II, at 98:18-99:25; id. at 102:3-22.   Snow-Armendariz testified that, while Grado informed her that Ortiz made her feel uncomfortable, she was not sure if the conduct Grado described constituted a violation of the University's sexual harassment policy.   See Snow-Armendariz Deposition at 127:14-129:6; id. 171:13-25.

On February 10, 2004, the University received an anonymous complaint raising several issues about Ortiz' management of the Santa Teresa Campus.   The complaint triggered an investigation that ultimately led to Ortiz' termination.   See Grado's Fact Statement, Exhibit 6, Letter from Anonymous to Bob Barker, Randy Lichtenfeld, and Christine Springfield (received February 10, 2004)("February 10, 2004 Letter"); Defendant's Fact Response at 6.   The letter stated:

Lately Manny has been behaving very rude and mean to me and the others (but mostly

us women) here at work. . . . Some of us have seen him bullying different women in different departments, using sex and the fact that he is stronger than them. We are scared. I know I am not the only one to see this happen.

February 10, 2004 Letter.

The University immediately began an investigation into the anonymous complaint. See Harper Deposition at 83:1-84:9. On February 11, 2004, the University conducted random employee interviews at Santa Teresa. See id. at 117:4-24; Defendant's Separate Statement of Facts in Support of its Motion for Summary Judgment, filed August 4, 2006 (Doc. 65)("Defendant's Fact Statement"), Exhibit B, Attachment 56, Investigation Summary (dated February 18, 2004)("February 18, 2004 Investigation Summary"). Grado was one of thirteen employees the University interviewed that day. See Harper Deposition at 83:1-84:9; February 18, 2004 Investigation Summary.

As a result of those interviews, the University placed Ortiz on administrative leave, pending the final outcome of the investigation. See Defendant's Fact Statement, Exhibit C, Deposition of Tracy Bonjean, Vol. II, 29:4-30:19 (taken July 12, 2006). On February 18, 2004, a University investigator interviewed Ortiz concerning the allegations against him. See February 18, 2004 Investigation Summary. Also on February 18, 2004, the University received an e-mail from Grado, stating that she "was unable to give a detailed report of the incidents" during her February 11, 2004 interview, and including an attachment containing a more detailed description of "the incidents." Defendant's Fact Statement, Exhibit B, Attachment 61, E-mail from Loretta Rodriguez to April Harper (dated February 18, 2004).

In her February 18, 2004 communication to the University, Grado stated that Ortiz called her and came by her cubicle excessively, asked her personal questions, told her that, to him, "partying" meant kissing and having sex, asked her if she liked to party, showed her a yearbook picture of

himself and talked about how good he looked in it, offered to pay for a hotel room, and demeaned women continuously.  See id.  The University asserts that Grado's allegations against Ortiz were included in the investigation that led to his termination.  See Harper Deposition at 134:20-135:11. Grado contends, however, that the University never investigated her specific allegations of sexual harassment against Ortiz, or her supervisors' failure to report complaints about Ortiz' behavior up the University's chain of command.  See Grado Fact Statement at 2; Grado's Opposition at 12.

At the conclusion of its investigation, and after unsuccessful attempts to reach an amicable separation, the University terminated Ortiz on April 16, 2004.  See Defendant's Fact Statement, Exhibit D, Attachment 12, Termination Letter from Tracy Bonjean to Manuel Ortiz (dated April 16, 2004).  Ortiz had received, on several occasions, training on the University's sexual harassment policies.  See Defendant's Fact Statement, Exhibit D, Deposition of Manuel Ortiz at 93:13-95:17 (taken April 11, 2006)("Ortiz Deposition"); id., Attachment 4.  There is evidence, however, that supervisors and employees at the Santa Teresa campus did not take sexual harassment training seriously and that it was ineffective.  See Grado Deposition at 29:19-30:3; Russo Deposition, Vol. I, at 37:16-38:3; id. at 53:3-12; Russo Deposition, Vol. II, at 26:5-20.

On April 21, 2006, the University received the Charge of Discrimination that Grado had filed with the EEOC on April 15, 2006.  See Defendant's Fact Statement, Exhibit E, Notice of Charge of Discrimination (dated April 20, 2006).  The Charge of Discrimination includes allegations that Ortiz sexually harassed Grado by asking her sexual questions and calling her work phone and visiting her cubicle excessively, that the Human Resources Department did not properly investigate her complaints about Ortiz, and that she was not chosen for a promotion to a Financial Aid Counselor position in retaliation for refusing Ortiz' advances.  See id.  Grado continued to work for the

University at the Santa Teresa Campus until May 28, 2004, when she resigned to accept employment with another company.  See Grado Deposition at 206:1-23; Defendant's Fact Statement, Exhibit A, Attachment 13, Resignation Letter from Loretta Grado to Pam Snow and Brian Russo.

At her March 8, 2006 deposition, Grado described several examples of Ortiz' behavior towards her, she testified: (i) that Ortiz showed her pictures of his high school yearbook and asked her if she thought he was good looking, see Grado Deposition at 55:13-17; (ii) that Ortiz asked her to leave the building with him because he had something to show her, see id. at 74:11-15; (iii) that Ortiz asked her when she was going to give in, see id. at 86:10-24; (iv) that Ortiz ran his fingers through her hair, see id. at 51:25-52:7; and (v) that Ortiz tried to kiss her, see id. at 89:14-19.  Grado also alleged that Ortiz retaliated against her for refusing his advances.  She testified that Ortiz told her about an open Financial Aid Counselor position, see id. 78:15-24, that Ortiz encouraged her to apply for the position, see id., that Ortiz said he would waive the University's standard requirement that an employee be in a position for at least six months before moving to another position, see id. at 79:1-3, that Ortiz interviewed her for the position, see id. at 81:19-25, and that, the day before the filling of the position was announced, she refused a request by Ortiz to party, see id. at 196:1-3. Ortiz had the final say in determining who would fill the Financial Aid Counselor position.  See Russo Deposition, Vol. I, at 148:15-23; Snow-Armendariz Deposition at 133:18-22.  When Grado questioned Ortiz about why she did not receive the position, however, Ortiz told her that it was not his decision.  See Grado Deposition at 83:20-23.

Grado first interviewed for the Financial Aid Counselor position with Financial Aid Manager Jimmy Armendariz.  See Defendant's Fact Statement, Exhibit G, Deposition of Jaime Armendariz at 84:2-87:19 (taken March 8, 2006)("Armendariz Deposition"); Grado's Opposition at 14.  Grado then

interviewed with Accounting Manager Rocio Martinez.  See Armendariz Deposition at 84:2-87:19.

Martinez selected another candidate over Grado to advance to the final interview stage with Ortiz,

because Martinez believed the other candidate had performed better in the interview and had stronger

recommendations.  See Defendant's Fact Statement, Exhibit H, Deposition of Rocio Martinez at

83:14-84:18.  Martinez made her selection on November 17, 2003, without having any conversations

with Ortiz about the selection process.  See id. at 84:21-85:2.

Additionally, Grado testified that, as a result of Ortiz' conduct, she had between five and ten

nightmares, suffered loss of sleep, saw a doctor twice for her emotional distress and sleeping

problems, and took some sample medications that the doctor gave her.  See Grado Deposition at

218:3-221:25.  Grado further testified that the emotional distress Ortiz caused her took away her

ability to care for her children for one month.  See id. at 227:20-228:25.  At her deposition, Grado

also stated that Ortiz' behavior towards her would make her so upset that she would feel like

vomiting.  See id. at 60:20-25.

## PROCEDURAL BACKGROUND

On September 30, 2005, the EEOC filed its initial Complaint, alleging, pursuant to Title VII

of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991, that Grado and Lorena

Pinon were subjected to sexual harassment, which created a hostile work environment, and

retaliation.  See Complaint/Jury Trial Demand, filed September 30, 2005 (Doc. 1).  The EEOC filed

its First Amended Complaint on October 12, 2005, correcting typographical errors contained in

paragraph eight of its initial Complaint.  See First Amended Complaint/Jury Trial Demand at 1, 3,

filed October 12, 2005 (Doc. 3).

On January 31, 2006, Pinon filed her Motion to Intervene.  See Motion to Intervene, filed

January 31, 2006 (Doc. 14).  The Court granted Pinon's motion on February 26, 2006.  See Order, filed February 26, 2006 (Doc. 17).  Subsequently, on February 13, 2006, Pinon filed a Complaint, which includes federal claims for harassment and retaliation, and state law claims for constructive discharge, breach of contract, and negligent supervision.  See Complaint for Damages for Sexual Harassment, Retaliation, Constructive Discharge, Breach of Contract and Negligent Supervision and Retention, filed February 13, 2006 (Doc. 18).

Similarly, Grado filed a motion to intervene, pursuant to rule 24(a) of the Federal Rules of Civil Procedure and 42 U.S.C. § 2000e-5(f)(1), on February 22, 2006.  See Motion to Intervene at 1, filed February 22, 2006 (Doc. 19).  On May 10, 2006, the Court granted Grado's motion and her leave to file a complaint.  See Memorandum Opinion and Order, filed May 10, 2006 (Doc. 49).  Grado's Complaint, which was filed on May 26, 2006, includes federal claims for quid pro quo sexual harassment, hostile working environment, and retaliation, and state law claims for negligent supervision, intentional infliction of emotional distress, and breach of implied contract.  See Complaint of Intervenor Loretta Grado at 13-15, filed May 26, 2006 (Doc. 52).

On August 4, 2006, the University filed a summary judgment motion requesting that the Court grant judgment in its favor on all of Grado's claims, the issue of punitive damages, and the Faragher/Ellerth defense.  See Summary Judgment Motion at 1, 7-23.  The University argues that, even when the facts are viewed in the light most favorable to the Plaintiffs, the Plaintiffs cannot satisfy one or more of the legal elements for each of the claims they bring or for punitive damages to be applicable.  See id.  Further, the University contends that there is not a genuine issue of material fact concerning whether it can satisfy the elements of the Faragher/Ellerth defense, and that, therefore, it is entitled to summary judgment on the Plaintiffs' sexual harassment claims.  See id. at 14-15.

Also on August 4, 2006, Grado filed her partial summary judgment motion.  See Partial Summary Judgment Motion at 1.  Grado argues that, even when the facts are viewed in the University's favor, it cannot satisfy the legal elements of the Faragher/Ellerth defense it asserts, and that, as such, the Court should enter summary judgment on that issue for the Plaintiffs.

On August 16, 2006, Pinon and the University, pursuant to rule 41(a)(1) of the Federal Rules of Civil Procedure, stipulated to the dismissal, with prejudice, of all of Pinon's claims.  See Stipulation for Dismissal with Prejudice of Lorena Pinon, filed August 16, 2006 (Doc. 73).

On August 29, 2006, Grado filed Plaintiff-Intervenor Loretta Grado's Opposition to Defendant's Motion for Summary Judgment.  See Plaintiff-Intervenor Loretta Grado's Opposition to Defendant's Motion for Summary Judgment, filed August 29, 2006 (Doc. 82)("Grado's Opposition").  In her Opposition, Grado states that she is no longer pursuing her breach of contract claim.  See id. at 39 n.7.

## LAW REGARDING SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)).  An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party.  Id. at 249-50 (citations omitted).  Mere assertions or conjecture as to factual disputes are not enough

to survive summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir.

1988).  The court may consider only admissible evidence when ruling on a motion for summary

judgment.  See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir.

1985)(citing Fed. R. Civ. P. 56(e)).

If a defendant seeks summary judgment, it has an "initial burden to show that there is an

absence of evidence to support the nonmoving party's case." Munoz v. St. Mary-Corwin Hosp., 221

F.3d 1160, 1164 (10th Cir. 2000)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir.

1995))(internal quotations omitted).  Upon meeting that burden, the plaintiff must "identify specific

facts that show the existence of a genuine issue of material fact." Id. (citations and internal

quotations omitted).  "The party opposing the motion must present sufficient evidence in specific,

factual form for a jury to return a verdict in that party's favor." Id. (citations and internal quotations

omitted).  The mere existence of a scintilla of evidence in support of the plaintiff's position is not

sufficient; there must be evidence on which the fact finder could reasonably find for the plaintiff.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The non-moving party must "go beyond the

pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex

Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted).

> Rule 56(c) mandates the entry of summary judgment, after adequate time for
> discovery and upon motion, against a party who fails to make a showing sufficient to
> establish the existence of an element essential to that party's case, and on which that
> party will bear the burden of proof at trial.

Id. at 322-23.  "In a response to a motion for summary judgment, a party cannot rest on ignorance

of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope

-12-

that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  The

non-moving party "must do more than simply show that there is some metaphysical doubt as to the

material facts." Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1266 (10 Cir.1996).  A court

must look at the record in the light most favorable to the party opposing summary judgment.  See

Smith v. Denver Pub. Sch. Bd., No. 91-1285, 1994 WL 651978, at *3 (10th Cir. November 18,

1994).

## LAW REGARDING SEXUAL HARASSMENT

### 1.      Quid Pro Quo.

Section 703(a) of Title VII forbids an employer "[i] to fail or refuse to hire or to discharge

any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. §

2000e-2(a)(1).  "When a plaintiff proves that a tangible employment action resulted from a refusal

to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself

constitutes a change in the terms and conditions of employment that is actionable under Title VII."

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998).  Tangible employment actions are

those employment actions that constitute significant changes in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits.  See id. at 761.

"The gravamen of a quid pro quo claim is that a tangible job benefit or privilege is conditioned

on an employee's submission to sexual blackmail and that adverse consequences follow from the

employee's refusal."  Gary v. Long, 59 F.3d 1391, 1395 (D.C. Cir. 1995).  An express statement

from the harasser linking employment benefits to the plaintiff's submission to sexual advances is not

required.  See Brandau v. State of Kansas, 968 F. Supp. 1416, 1421 (D. Kan. 1997).  The harasser

and the harassed also need not have reached agreement as to the consequences of the employee's

refusal to submit to sexual advances.  See id.  For Title VII purposes, a supervisor's tangible

employment action is an act of the employer.  Burlington Indus., Inc. v. Ellerth, 524 U.S. at 762.

<strong>2.     Hostile Environment.</strong>

"Quid pro quo harassment occurs when submission to sexual conduct is made a condition of

concrete employment benefits.  Alternatively, hostile work environment harassment arises when

sexual conduct 'has the purpose or effect of unreasonably interfering with an individual's work

performance or creating an intimidating, hostile, or offensive working environment.'"  Hicks v. Gates

Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987)(internal citations omitted)(quoting Meritor Sav.

Bank v. Vinson, 477 U.S. 57, 65 (1986)).  For a hostile environment claim to survive a motion for

summary judgment, a plaintiff must demonstrate that a rational jury could find that the workplace was

permeated with discriminatory intimidation, ridicule, and insult, that "is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment."  Zisumbo v. McCleodUSA Telecomm. Servs., Inc., 154 Fed. Appx. 715, 725-26 (10th

Cir. 2005)(internal quotations omitted)(quoting MacKenzie v. City & County of Denver, 414 F.3d

1266, 1280 (10th Cir. 2005)).  See O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1097 (10th

Cir. 1999)(noting that "the severity and persuasiveness evaluation is particularly unsuited for

summary judgment because it is quintessentially a question of fact"); Meritor Sav. Bank v. Vinson,

477 U.S. at 68 (noting that the gravamen of any sexual harassment claim is that the alleged sexual

advances were unwelcome, and that whether  particular conduct was unwelcome presents difficult

credibility determinations committed to the trier of fact).  "Severity and pervasiveness are evaluated

-14-

according to the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Zisumbo v. McCleodUSA Telecomm. Servs., Inc., 154 Fed. Appx. at 725-26 (internal quotations omitted)(quoting Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005)).  Impact on an employee's psychological well-being is relevant to determining whether the plaintiff actually found an environment hostile.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

The relevant test is a disjunctive one, requiring that the harassing conduct be sufficiently severe or sufficiently pervasive.  See Smith v. Nw. Fin. Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir. 1997).  With respect to severity, a plaintiff must first show that he or she believes that the conduct experienced was so severe that it created an abusive or hostile environment.  See id.  Second, the plaintiff must demonstrate that the harassing conduct was sufficiently severe that a reasonable person would find the work environment abusive or hostile.  See id.  With regard to pervasiveness, "isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct."  Id. at 1415.  In this context, the word "pervasive" is not a counting measure; the number, sequence, and timing of the conduct, and the nuances of an environment that each instance of discriminatory behavior imposes are also important factors.  See id.  Incidents of harassment directed at employees other than the plaintiff can be used as proof of the plaintiff's hostile work environment claim.  See Hicks v. Gates Rubber Co., 833 F.2d at 1415.

An employer is subject to vicarious liability to a victimized employee for a supervisor's creation of an actionable hostile environment, if the supervisor has immediate or successively higher authority over the employee.  See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).

3.    **Affirmative Defense.**

Pursuant to <u>Faragher v. City of Boca Raton</u> and <u>Burlington Industries, Inc. v. Ellerth</u>, a defending employer may raise an affirmative defense to liability for damages, subject to proof by a preponderance of the evidence.  <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. at 807; <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. at 765.  The <u>Faragher</u>/<u>Ellerth</u> defense comprises two necessary elements: (i) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (ii) that the plaintiff employee unreasonably failed to take advantage of any employer provided preventive or corrective opportunities or to avoid harm otherwise.  <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. at 807; <u>Burlington Indus., Inc. v. Ellerth</u> 524 U.S. at 765; <u>Dees v. Johnson Controls World Servs., Inc.</u>, 168 F.3d 417, 422 (10th Cir. 1999).

> While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.  And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

<u>Faragher v. City of Boca Raton</u>, 524 U.S. at 807; <u>Burlington Indus., Inc. v. Ellerth</u> 524 U.S. at 765. The affirmative defense is not available to an employer that has taken an adverse tangible employment action against the plaintiff-employee.  <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. at 807; <u>Burlington Indus., Inc. v. Ellerth</u> 524 U.S. at 765.

## LAW REGARDING RETALIATION

To establish a case for retaliation, a plaintiff must show: "[i] that he engaged in protected opposition to discrimination[;] [ii] that a reasonable employee would have found the challenged action

materially adverse[;] and [iii] that a causal connection existed between the protected activity and the materially adverse action." Argo v. Blue Cross & Blue Shield of Kan., 452 F.3d 1193, 1202 (10th Cir. 2006). See O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001). A plaintiff may demonstrate a causal connection with evidence of circumstances that justify an inference of retaliatory motive, such as an adverse action following protected conduct. See O'Neal v. Ferguson Constr. Co., 237 F.3d at 1253 (quoting Burrus v. United Tel. Co. of Kan., 683 F.2d 339, 343 (10th Cir. 1982)). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." O'Neal v. Ferguson Constr. Co., 237 F.3d at 1253 (citing Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir. 1997)). "[A] one and one-half month period between protected activity and adverse action may, by itself, establish causation." O'Neal v. Ferguson Constr. Co., 237 F.3d at 1253 (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)).

## NEW MEXICO LAW REGARDING
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The following elements must be proven to establish a claim of intentional infliction of emotional distress: "[i] the conduct in question was extreme and outrageous; [ii] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [iii] the plaintiff's mental distress was extreme and severe; and [iv] there is a causal connection between the defendant's conduct and the claimant's mental distress." Trujillo v. N. Rio Arriba Elec. Coop, Inc., 2002-NMSC-004, at ¶ 25. For purposes of the tort of intentional infliction of emotional distress, New Mexico law adopts the Restatement Second of Torts' definition of extreme and outrageous conduct. See id. According to the Restatement, extreme and outrageous conduct is that which is "so outrageous in character, and

so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Restatement Second of Torts § 46 cmt. d.  <u>See</u> U.J.I. 13-1628 N.M.R.A. 2001 ("Extreme and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person.").  "Extreme and severe emotional distress means that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." <u>Trujillo v. N. Rio Arriba Elec. Coop, Inc.</u>, 2002-NMSC-004, at ¶ 28.  "The law intervenes only where the distress is so severe that no reasonable person could be expected to endure it." <u>Id.</u> (quoting Restatement Second of Torts § 46 cmt. j.).  The extreme and severe emotional distress element of intentional infliction of emotional distress was not met, for example, where a plaintiff felt "lousy," was depressed, was prescribed Prozac, slept long hours, and displayed erratic eating habits.  <u>Trujillo v. N. Rio Arriba Elec. Coop, Inc.</u>, 2002-NMSC-004, at ¶ 28.

## <u>NEW MEXICO LAW REGARDING NEGLIGENT SUPERVISION</u>

An entity may be held liable in tort for negligent supervision of an employee even though it is not responsible for the wrongful acts of the employee under the doctrine of respondeat superior. <u>See</u> <u>Los Ranchitos v. Tierra Grande, Inc.</u>, 116 N.M. 222, 228, 861 P.2d 263, 269 (Ct. App. 1993).

> The proper standard for determining whether an employer should be held liable for negligent supervision or retention of an employee does not require proof of actual knowledge of the employee's lack of skills or unfitness to perform such work, but whether the employer knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee who is entrusted with such position.

<u>Id.</u>  <u>See</u> <u>Chavez v. Thomas & Betts Corp.</u>, 396 F.3d 1088, 1099 (10th Cir. 2005)(applying New Mexico law and finding evidence sufficient to support a negligent supervision claim where plaintiff

repeatedly complained to management about her supervisor's harassment).

## LAW REGARDING PUNITIVE DAMAGES

Under Title VII, punitive damages are available if a plaintiff proves that an employer engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Id. at 1097 (quoting 42 U.S.C. § 1981a(b)(1)). "'Malice' and 'reckless indifference' in this context refer not to the egregiousness of the employer's conduct, but rather to the employer's knowledge that it may be acting in violation of federal law." Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1269 (10th Cir. 2000)(citing Kolstad v. Am. Dental Ass'n, 527 U.S. 526 (1999)). Malice and recklessness are to be inferred when a manager responsible for setting or enforcing policy with regard to discrimination does not respond to complaints, despite knowledge of serious harassment. See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d at 1269.

Employer malice and recklessness in failing to remedy or prevent sexual harassment of which management-level employees knew or should have known is premised on direct liability, not derivative liability. See id. at 1270. The relevant inquiry is whether the employer had actual or constructive knowledge of the harassment, and whether its response was adequate. See id. "When a company specifically designates a particular employee within the company as a final person responsible for enforcing that company's policy against discrimination, then by the company's own designation, information provided to such an employee is knowledge to the company." Id. at 1270-71.

An employer cannot be held vicariously liable for punitive damages for the acts of a managerial employee, however, if the managerial employee's actions were contrary to the employer's good-faith efforts to comply with Title VII. See Cadena v. Pacesetter Corp., 224 F.3d 1203, 1210

(10th Cir. 2000).  At a minimum, to qualify for the good-faith punitive damages exclusion, an employer must at least adopt anti-discrimination policies, make a good faith effort to educate its employees about those policies and statutory prohibitions, and make good faith efforts to enforce anti-discrimination policies and laws.  See id. ("[E]ven if an employer [] adduces evidence showing it maintains [] a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware.").

With respect to negligent supervision, an award of punitive damages "is permissible upon a finding that the wrongdoer's conduct was willful, wanton, malicious, reckless, oppressive, grossly negligent, or fraudulent and in bad faith."  Chavez v. Thomas & Betts Corp., 396 F.3d at 1100 (quoting Nieto v. Kapoor, 268 F.3d 1208, 1222 (10th Cir. 2001)).  To demonstrate recklessness, a defendant must have acted intentionally and "with utter indifference to the consequences of its conduct."  Chavez v. Thomas & Betts Corp., 396 F.3d at 1100 (quoting Gonzales v. Surgidev Corp. 120 N.M. 133, 145, 899 P.2d 576, 588 (1995))(finding evidence sufficient to show employer acted recklessly where it was presented that supervisors had been present during some harassing incidents and the plaintiff had complained about harassment to management).

## ANALYSIS

Because the Court finds that disputed issues of material fact preclude the granting of summary judgment on Grado's sexual harassment, retaliation, negligent supervision, and punitive damages claims, the Court will deny the University's motion with respect to those claims.  The Court also finds that material factual disputes prohibit the granting of summary judgment on both the University's and Grado's summary judgment requests concerning the Faragher/Ellerth defense.  Accordingly, the

-20-

Court will deny the University's and Grado's motions insofar as they relate to that affirmative defense.  Finally, the Court concludes that, viewing all of the relevant facts in the light most favorable to Grado, Grado has not established that she can satisfy the legal elements necessary to succeed on an intentional infliction of emotional distress claim.  The Court will, therefore, grant the University's request for summary judgment on Grado's intentional infliction of emotional distress claim.

### A.   SEXUAL HARASSMENT

The Court concludes that summary judgment in favor of the University is not warranted on Grado's quid pro quo and hostile environment claims.  The Court also concludes that it should not grant summary judgment to either the University or Grado on the Faragher/Ellerth defense.

### 1.   Quid Pro Quo.

The University moves for summary judgment on Grado's quid pro quo sexual harassment claim based upon the assertions that Grado does not have any evidence to support her contention that Ortiz conditioned her receiving the Financial Aid Counselor position on accepting his sexual overtures, and that the undisputed facts demonstrate that Ortiz was not involved with the Financial Aid Counselor hiring decision.  See Summary Judgment Motion at 12-13.  The Court believes, however, that there are genuine issues of material fact, which preclude granting the University summary judgment on this claim.

Grado has presented evidence that Ortiz behaved inappropriately and made repeated sexual advances towards her before, after, and during their discussions about the Financial Aid Counselor position.  See Grado Deposition at 51:25-52:7; id. at 55:13-17; id. at 74:11-15; id. at 78:12-24; id. at 79:1-3; id. at 81:19-25; id. at 86:10-24; id. at 89:14-19; id. at 196:1-3.  Moreover, despite the University's argument that Armendariz and Martinez, and not Ortiz, made the Financial Aid

Counselor hiring decision, Grado has presented evidence that Ortiz had the final say in determining who would fill the position, see Russo Deposition, Vol. I, at 148:15-23, Snow-Armendariz Deposition at 133:18-22, that Ortiz interviewed her for the position, see Grado Deposition at 79:1-3, and that Ortiz asked her if she would like to go party, a request she refused, the day before the filling of the position was announced, see id. at 196:1-3.

Considering the inconsistencies in the record concerning the association between Ortiz' allegedly harassing behavior and his discussion of the Financial Aid Counselor position, the disputed contentions regarding Ortiz' level of involvement with filling the Financial Aid Counselor position, that an express statement from Ortiz linking employment benefits to Grado's submission to his sexual advances is not required, see Brandau v. Kansas, 968 F. Supp. at 1421, and that Ortiz and Grado need not have reached an agreement as to the consequences of her refusal to submit to his sexual advances, see id., the Court concludes that factual disputes precluding the granting of summary judgment exist.

## 2.    **Hostile Environment.**

The University contends that summary judgment is warranted because Grado's allegations do not meet the legal standard of severity or pervasiveness necessary to make out a hostile environment claim. See Summary Judgment Motion at 8. The Court, however, believes that Grado has presented evidence sufficient to survive a request for summary judgment on this claim. By including within her complaint a claim for hostile environment and presenting evidence that Ortiz' conduct made her uncomfortable, upset, and led her to ask Russo if she should be concerned about sexual harassment, see Grado Deposition at 60:20-25, id. at 68:11-23, Russo Deposition, Vol. I, at 12:20-13:2,  Grado established that she believed Ortiz' conduct towards her was severe enough to

create a hostile environment, see Smith v. Nw. Fin. Acceptance, Inc., 129 F.3d at 1413 (stating that,

to establish severity, a plaintiff first must show that, subjectively, the complained of behavior created

a hostile environment).  Grado has also produced evidence that could lead a reasonable person to

believe that Ortiz created a hostile work environment.  See id. (holding that, to establish severity, a

plaintiff must, secondarily, demonstrate that the harassing conduct was sufficiently severe to create

an objectively hostile environment).  Grado presented evidence that Ortiz asked her sexual questions,

see E-mail from Loretta Rodriguez to April Harper, constantly called her work phone and visited her

cubicle, see id., asked her if she thought he was good looking, see Grado Deposition at 55:13-17,

asked her to leave the building with him, see id. at 74:11-15, asked her when she was going to give

in, see id. at 86:10-24, asked her to party with him, see E-mail from Loretta Rodriguez to April

Harper, ran his fingers through her hair, see Grado Deposition at 51:25-52:7, and tried to kiss her,

see id. at  89:14-19.  Grado, moreover, has presented evidence that Ortiz' conduct was pervasive;

Grado testified  that Ortiz' conduct essentially spanned the duration of her employment at the Santa

Teresa campus.  See id. at 66:13-18; id. at 196:1-3.  While the University contends that Grado did

not notify it of much of this alleged behavior, Grado represents that she notified Russo, and thus

effectively the University, of Ortiz' behavior towards her.  See at 60:1-61:18; id. at 66:13-69:3; id.

at 84:14-85:7.  Based on the foregoing, the Court finds that there are relevant issues of material fact

regarding whether Ortiz' behavior towards Grado was severe and pervasive, and when and what

Grado reported to Russo, that prevent the Court from granting the University summary judgment on

the hostile work environment claim.

3.       **Affirmative Defense.**

Both the University and Grado move for summary judgment on the Faragher/Ellerth defense. That affirmative defense to sexual harassment claims comprises two necessary elements: (i) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (ii) that the plaintiff employee unreasonably failed to take advantage of any employer provided preventive or corrective opportunities or to avoid harm otherwise.  See Faragher v. City of Boca Raton, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765.  With respect to the first element, the University presents evidence that it immediately responded to the February 10, 2004 anonymous complaint raising issues about Ortiz.  See Harper Deposition at 83:1-84:9.  The University also presents evidence that Grado failed to avail herself of any corrective opportunities -- the University maintains that Grado reported Ortiz' conduct only once each to Russo and Snow-Armendariz before the University began its investigation into the February 10, 2004 complaint, and that Grado told Russo and Snow-Armendariz only that Ortiz' called her work phone often, visited her cubicle frequently, and made her feel uncomfortable.  See Russo Deposition, Vol. II, at 98:18-99:25; id. at 102:3-22; Snow-Armendariz Deposition at 127:14-129:6; id. at 171:13-25.

Grado, however, presents evidence that Russo was informed numerous times about various incidents involving Ortiz' inappropriate sexually harassing conduct towards her.  See Grado Deposition at 60:1-61:18; id. at 66:13-68:25; id. at 84:14-85:7; Camp Deposition, Vol. I, at 232:6-9. Indeed, Russo testified that Grado may have complained to him about Ortiz as many as twenty times. See Russo Deposition, Vol II, at 79:23-80:2.  The Court believes that whether the Faragher/Ellerth defense applies depends, in large part, on when and to what extent Grado reported Ortiz' harassing behavior to Russo; the Court believes that facts concerning communications between Grado and

Russo about Ortiz may determine whether the two Faragher/Ellerth elements are met in this case.

Further, the Court notes that the Faragher/Ellerth defense is not available where a tangible adverse employment action was taken against the plaintiff-employee.  See Faragher v. City of Boca Raton, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765.  Grado submits that her not being hired for the Financial Aid Counselor position constituted a tangible adverse employment action.  See Memorandum in Support of Plaintiff Loretta Grado's Motion for Partial Summary Judgment at 5-6, filed August 8, 2006 (Doc. 67).  The University maintains, however, that Ortiz had nothing to do with filling the Financial Aid Counselor position.  See Summary Judgment Motion at 14-15.  As discussed above, Ortiz' role in the hiring decision for that position in unclear.  Given the material factual disputes that the parties raise with regard to Grado's reports to Russo and whether Grado's not being elevated to the Financial Aid Counselor position was a tangible adverse employment action, the Court concludes that summary judgment is not warranted on the Faragher/Ellerth issue.

### B.    RETALIATION

The Court will not grant the University summary judgment on Grado's retaliation claim.  The University argues that Armendariz and Martinez, not Ortiz, decided who to hire for the Financial Aid Counselor position.  See Summary Judgment Motion at 16.  The University also contends that Grado cannot establish a causal link between her complaints and her not receiving the promotion to the Financial Aid Counselor position.  See id.  Grado raises disputed issues of material fact, however, concerning whether Ortiz had the final say in who would receive the Financial Aid Counselor position, see Russo Deposition, Vol I, at 148:15-23, Snow-Armendariz Deposition at 133:18-22, regarding her engaging in protected conduct -- denying an invitation from Ortiz to party -- the day

before the filling of the position was announced, see Grado Deposition at 196:1-3, and respecting whether Ortiz took the adverse employment action -- not promoting Grado to the Financial Aid Counselor position -- against her because she refused his invitation and advances, see id.  The Court notes that a plaintiff can demonstrate the requisite causal connection by showing a very close proximity between the protected activity and the retaliatory conduct.  See O'Neal v. Ferguson Constr. Co., 237 F.3d at 1253.

Given the disputed facts concerning Ortiz' involvement with filling the Financial Aid Counselor position, and considering Grado's contention that she engaged in protected activity by refusing Ortiz' invitation and that the announcement that someone else would be filling the position came the day after the protected refusal, the Court concludes that judgment as a matter of law is not warranted with respect to Grado's retaliation claim.

## C.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Court will grant the University summary judgment on Grado's intentional infliction of emotional distress claim.  To prevail on a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that he or she suffered extreme and severe mental illness.  See Trujillo v. N. Rio Arriba Elec. Coop, Inc.,2002-NMSC-004, at ¶ 25.  "Extreme and severe emotional distress means that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances."  Id. at ¶ 28.

The Court finds that, even taking all of the relevant facts in the light most favorable to Grado, Grado has not presented evidence of extreme and severe emotional distress.  The evidence Grado presents with regard to her intentional infliction of emotional distress claim does not create a genuine issue of material fact precluding the granting of judgment as a matter of law.  Grado asserts that

-26-

Ortiz' behavior towards her made her feel like vomiting, caused her to have between five and ten nightmares, caused her to lose sleep, led her to seek medical assistance, led her to take some sample medications her physician provided, and prevented her from caring for her children for a month, because she was too tired and emotionally distracted to do so. See Grado Deposition at 60:20-25; id. at 218:3-221:25; id. at 227:20-228:25.

The Court finds that those facts are insufficient to meet the high standard necessary to establish the extreme and severe element under New Mexico law. See Dominguez v. Stone, 97 N.M. 211, 214, 638 P.2d 423, 426 (Ct. App. 1981)("Emotional distress . . . includes all highly unpleasant mental reactions, such as . . . horror, . . . humiliation, embarrassment, . . . and nausea. It is only where it is extreme that the liability arises. . . . The law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it.")(quoting Restatement Second of Torts § 46, cmt. j). In Trujillo v. N. Rio Arriba Elec. Coop, Inc., the plaintiff presented evidence that he had suffered distress similar to that of which Grado complains. The plaintiff in Trujillo presented evidence that he felt "lousy," was depressed, was prescribed Prozac, slept long hours, and displayed erratic eating habits. See id., 2002-NMSC-004, at ¶ 28. The New Mexico Supreme Court held that such evidence was insufficient to satisfy the extreme and severe emotional distress element of an intentional infliction of emotional distress claim. See id. Applying New Mexico precedent to this case, the Court finds that the evidence of distress Grado presents is similarly insufficient to meet the tort claim's extreme and severe element. As such, the Court concludes that the University is entitled to summary judgment on Grado's intentional infliction of emotional distress claim.

### D.    NEGLIGENT SUPERVISION

The University contends that it is entitled to summary judgment on Grado's negligent supervision claim, because she cannot show that a genuine issue of material fact exists regarding whether Ortiz engaged in a wrongful act that injured her and because she cannot demonstrate that the University was negligent in supervising Ortiz.   The Court disagrees.   Grado has presented evidence raising issues of material fact concerning whether Ortiz' conduct was wrongful and injurious.

Grado has presented evidence demonstrating that Ortiz violated her right to be free from discrimination and retaliation.   See E-mail from Loretta Rodriguez to April Harper; Grado Deposition at 51:25-52:7; id. at 55:13-17; id. at 74:11-15; id. at 86:10-24; id. at 89:14-19; id. at 196:1-3. Further, Grado presented evidence that she frequently reported the extent of Ortiz' harassing behavior to Russo, see id. at 60:1-61:18; id. at 66:13-69:3; id. at 84:14-85:7, and the Court believes that such evidence raises issues of fact regarding the University's knowledge of Ortiz' unfitness to perform the job of campus administrator.   The Court notes that a plaintiff-employee need only prove that the employer-defendant knew or reasonably should have known that an employee might cause some harm.   See Chavez v. Thomas & Betts Corp., 396 F.3d at 1099.   Considering the foregoing, the Court concludes that Grado has raised genuine issues of material fact concerning the necessary elements of a negligent supervision claim and that summary judgment in favor of the University on that claim is inappropriate.

### E.    PUNITIVE DAMAGES

The Court disagrees with the University's contention that it is entitled to summary judgment on the issue of punitive damages.   A plaintiff must establish malice or recklessness to recover punitive

damages on a Title VII claim.  See Chavez v. Thomas & Betts Corp., 396 F.3d at 1097.  Malice and recklessness are to be inferred when a manager responsible for enforcing anti-discrimination policy does not respond to complaints, despite knowledge of serious harassment.  See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d at 1269.  Moreover, when a company specifically designates a particular employee as a final person responsible for enforcing the company's anti-discrimination policy, information provided to such an employee constitutes knowledge to the company.  See id. at 1270-71.  Further, the good-faith exception to punitive damages is not available if the employer failed to adequately address Title VII violations of which it was aware.  See Cadena v. Pacesetter Corp., 224 F.3d at 1210.

Grado has presented evidence that Russo was her direct supervisor, see Grado Deposition at 35:5-18, Snow-Armendariz Deposition at 69:17-24, that, by its own designation, the company defined Russo as a final person responsible for enforcing its anti-discrimination policy, see Discrimination and Harassment Policy, and that, on numerous occasions, she and Camp informed Russo about the nature and extent of Ortiz' sexually harassing behavior towards her, see 60:1-61:18; id. at 67:9-16; id. at 68:11-69:3; id. at 84:14-85:7; Camp Deposition, Vol. I, at 232:6-9.  The Court believes that, as with several of the claims discussed above, the issue of punitive damages turns on what and when Grado told Russo about Ortiz' behavior.  The Court finds that Grado has raised issues of material fact sufficient to survive the University's request for summary judgment on Title VII punitive damages.

The Court reaches the same conclusion with regard to whether the University is entitled to summary judgment concerning punitive damages associated with Grado's negligent supervision claim.  Grado may demonstrate that the University acted recklessly to recover punitive damages on her

negligent supervision claim.  Because, as noted in the preceding paragraph, Grado has presented evidence raising material factual issues concerning the University's knowledge and whether its actions or omissions were reckless in the face of the knowledge it had, see Snow-Armendariz Deposition at 69:17-24, Grado Deposition at 35:5-18, id. at 60:1-61:18; id. at 67:9-16; id. at 68:11-69:3; id. at 84:14-85:7; Camp Deposition, Vol. I, at 232:6-9, Discrimination and Harassment Policy, the Court will deny the University's request for summary judgment on this issue, see Chavez v. Thomas & Betts Corp., 396 F.3d at 1100 (finding evidence sufficient to show employer acted recklessly where it was presented that supervisors had been present during some harassing incidents and the plaintiff had complained about harassment to management).

Because the Court finds that Grado presented evidence that raises genuine issues of material fact with respect to her claims for sexual harassment, retaliation, negligent supervision, and punitive damages, the Court will deny the University's request for summary judgment on those claims. Because the Court further finds that both the University and Grado have submitted evidence demonstrating genuine factual issues with regard to the Faragher/Ellerth defense, the Court will deny their opposing motions for summary judgment on that affirmative defense issue.  Finally, because the Court concludes that, viewing all of the relevant evidence in the light most favorable to Grado, Grado cannot establish the elements necessary to satisfy an intentional infliction of emotional distress claim, the Court will grant summery judgment to the University on that claim.

**IT IS ORDERED** that the Defendant's Motion for Summary Judgment is granted in part and denied in part.  Summary judgment is entered in the University's favor on Grado's intentional infliction of emotional distress claim.  All of the other requests for summary judgment contained within the University's summary judgment motion are denied.  The Court will also deny Plaintiff

Loretta Grado's Motion for Partial Summary Judgment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Mary Jo O'Neill
  Regional Attorney
Sally Shanley
  Acting Supervisory Trial Attorney
Loretta Medina
  Senior Trial Attorney
Equal Employment Opportunity
  Commission
Phoenix District Office
Phoenix, Arizona

-- and --

Veronica A. Molina
  Trial Attorney
Equal Employment Opportunity Commission
Albuquerque Area Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Joleen K. Youngers
Almanzar & Youngers, P.A.
Las Cruces, New Mexico

  *Attorneys for Intervenor Lorena Pinon*

Reed N. Colfax
Relman & Associates, PLLC
Washington, D.C.

  *Attorneys for Intervenor Loretta Grado*

-31-

Stanley K. Kotovsky, Jr.
The Tinnin Law Firm
Albuquerque, New Mexico

-- and --

James K. Mackie
Matthew D. Mitchell
Snell & Wilmer, L.L.P.
Phoenix, Arizona

   *Attorneys for the Defendant*